FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO       17  F  3: 17
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N D I C T M E N T |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE |
| v. | ) | **1 : 15 CR 222** |
| | ) | |
| DELORES L. KNIGHT, | ) | CASE NO. _____ |
| THERESA L. ADAMS, | ) | Title 18, Sections 1349, 1347, |
| ISAAC R. KNIGHT, | ) | 1035, 1028A(a)(1), 1957, 2, |
| SONJA N. FERRELL, and | ) | and 982(a)(7), United States |
| JULIET L. BONNER, | ) | Code |
| | ) | |
| Defendants. | ) | |

**JUDGE NUGENT**

The Grand Jury charges:

## COUNT 1

(Conspiracy to Commit Health Care Fraud – 18 U.S.C. § 1349)

### General Allegations

At all times material herein:

1.      Defendant DELORES L. KNIGHT ("D.KNIGHT") was one of the owners and officers of Just Like Familee II, INC. ("JLF II") and Just Like Familee III, Inc. ("JLF III"), and resided in Cleveland and Macedonia, Ohio.

2.      Defendant THERESA L. ADAMS ("ADAMS") was one of the owners and officers of JLF II and JLF III.   ADAMS was one of the incorporators of Elegance Home Health, Inc. ("Elegance"), as well as the president and administrator of Elegance.   ADAMS resided in Cleveland Heights and Twinsburg, Ohio.

3.      Defendant ISAAC R. KNIGHT ("I.KNIGHT") was the manager of the JLF III office located in Mentor, Ohio.   I.KNIGHT was also one of the incorporators of Elegance, as well as the owner and administrator.   I.KNIGHT resided in Mentor and Macedonia, Ohio.

4.      Defendant SONJA N. FERRELL ("FERRELL") was a registered nurse licensed by the State of Ohio.   FERRELL worked at JLF II and JLF III as a registered nurse, the director of nursing and the clinical director.   FERRELL resided in Cleveland Heights, Ohio.

5.      Defendant JULIET L. BONNER ("BONNER") worked at JLF II and JLF III as a billing clerk and submitted billings to Medicaid, Medicare, PASSPORT and the Veterans Affairs ("VA") for home health services on behalf of JLF II and JLF III.   BONNER resided in Cleveland, Ohio.

JLF II and JLF III

6.      D.KNIGHT incorporated JLF II on or about March 1, 2005, and incorporated JFL III on or about April 27, 2006.   JLF II and JLF III were corporations organized and existing under the laws of the State of Ohio that provided home health services, including nursing, homemaker, and personal care services to elderly and disabled clients in their homes.   JLF II operated in order to bill the Pre-Admission Screening System Providing Options and Resources Today program ("PASSPORT").   JLF III operated in order to bill Medicaid, Medicare, VA, and private insurance programs.

7.      At various times, JLF II and JLF III operated out of several locations, including the following, all located within the Northern District of Ohio:

        a.      1991 Lee Road, Suite 205, Cleveland Heights, Ohio;

        b.      2000 Lee Road, Suite 20, Cleveland Heights, Ohio;

2

c.  8972 Darrow Road, Suite A301 and A302, Twinsburg, Ohio;

d.  2234 East Enterprise Parkway, Twinsburg, Ohio;

e.  7519 Mentor Avenue, Suite A114, Mentor, Ohio; and,

f.  2940 Noble Road, Suite 201, Cleveland Heights, Ohio.

8.  On or about May 3, 2006, D.KNIGHT and ADAMS opened and caused to be opened bank account number x1762 at Sky Bank (now known as Huntington National Bank account x2646) in the name of JLF III.  D.KNIGHT and ADAMS were signers for this account.

9.  On or about October 23, 2007, D.KNIGHT opened and caused to be opened bank account number x2662 at Huntington National Bank in the name of JLF II.  D.KNIGHT and ADAMS were signers for this account.

10.  Medicaid, Medicare, PASSPORT and the VA were health care benefit programs as defined under Title 18, Section 24(b), United States Code.

The Medicaid Program

11.  Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., established the grants to States for Medical Assistance Programs, popularly known as the Medicaid Program, or simply, "Medicaid" which was designed to provide medical services, equipment, and supplies to certain individuals and families with low income.  Medicaid was a federal and state funded health insurance program administered by the various states.  The United States Department of Health and Human Services ("HHS") funded approximately 60 percent of Ohio's Medicaid program. The State of Ohio initially administered its Medicaid Program, (sometimes referred to as the "medical assistance program," or the "Ohio Medicaid Program") through the Ohio Department of Jobs and Family Services ("ODJFS"), and then through the Ohio Department of Medicaid

3

("ODM").  A "Medicaid managed care organization" meant a managed care organization that has entered into a contract with ODJFS/ODM.

12.     In order to be reimbursed by Medicaid, a provider Home Health Agency ("HHA") rendering a service to Medicaid recipients was certified by CMS, a division of HHS, and entered into a "provider agreement" with ODJFS/ODM in which the provider agreed to comply with all applicable Medicaid statutes, regulations and guidelines.  On or about May 17, 2006, D.KNIGHT and ADAMS signed a CMS 855A "Medicare Enrollment Application" for JLF III.  On or about December 14, 2007, D.KNIGHT signed a "provider agreement" on behalf of JLF III with the Ohio Medicaid program.

13.     On or about December 11, 2007, CMS certified JLF III as a Medicare and Medicaid provider with an effective date of participation of August 21, 2007.

Medicaid Services Covered through the Ohio Home Care Program

14.     "Home health services" could be provided by an HHA which included, under the Ohio Medicaid program, home health nursing, home health aide, and skilled therapies such as physical and occupational therapy.  Persons providing such services were required to have the qualifications and training provided by Ohio regulations.  In addition, Ohio regulations required that providers create and maintain documents supporting the claims they submitted to Ohio Medicaid, including patient medical records, assessment and treatment records, including the Home Health Certification and the CMS Form 485, also known as the Plan of Care ("Plan of Care"), for each consumer.

15.     The initial Plan of Care for home health services was developed in collaboration with a physician and the home health agency.  The patient's physician was required to initially

4

certify and, thereafter, recertify every 60 days that the medical services provided by the home health agencies were medically required.   As a basis of the physician's certification, a registered nurse of the home health agency was required to complete a face-to-face encounter with the patient.   The registered nurse ("RN") prepared an evaluation on a CMS Form 485, or the Plan of Care, which was required to be signed by the RN and the physician to certify the need for home health care and any continuing care.

16.     A Home Health Aide ("Home Aide") was a health care provider who provided personal care services defined as tasks that assist the consumer with activities of daily living.   In accordance with federal Medicare and Medicaid laws and regulations, as well as rules and regulations published in the Ohio Administrative Code ("OAC"), personal care services were required to be provided in a face-to-face encounter and to be medically necessary.

17.     Home Aides could not bill for more hours than actually provided, and the patient was required to indicate that he or she accepted and received such services on a specific date.

The Medicare Program

18.     The Medicare Program ("Medicare") was a federal health care benefit program providing benefits to individuals who were over the age of 65 or to certain disabled persons ("Medicare beneficiaries").   CMS was the agency of HHS that administered the Medicare program.   Medicare coverage was divided into Parts A, B, C and D.   Part A covered, among other things, the cost of skilled nursing care and home health care administered to beneficiaries in their homes, including care provided by home health aides.

19.     "Skilled nursing care" was care given on a part-time or intermittent basis by either a RN or a Licensed Practical Nurse ("LPN").   If services were received from a LPN, they were

5

supervised by a RN.   Home health nurses provided direct care and also managed, observed, and

evaluated care provided.   In order for skilled nursing care to be covered by the Medicare home

health benefit, beneficiaries care must have been necessary and ordered by a physician for a

specific condition.   Beneficiaries must not need full time nursing care and must be "homebound."

Skilled nursing care included, but was not limited to:   administering IV drugs, shots, or tube

feedings; changing dressings; and, teaching about prescription drugs or diabetes care.

     20.     In order to be considered "homebound," two criteria must have been satisfied.

First, the patient must either:   (a) because of illness or injury, need the aid of supportive devices

such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or, the

assistance of another person in order to leave their place of residence; or, (b) have a condition such

that leaving his or her home was medically contraindicated.   If the patient met one of the first

criteria conditions, then the patient must also have met two additional requirements defined in the

second criteria, namely:   (a) there must have existed a normal inability to leave home; and, (b)

leaving home must have required a considerable and taxing effort.

     21.     "Home health care" was given on a part-time or intermittent basis if needed as

support services for skilled nursing care.   Home health care must have been part of the care for the

beneficiaries' illness or injury.   Medicare did not cover home health care unless the beneficiary

was also getting skilled care, such as:   nursing care or other physical therapy, occupational

therapy, or speech-language pathology services from the home health agency.

     22.     CMS administered Medicare Part A through private companies known as

"carriers."   The Carrier was the provider's chief source for coverage, billing, and enrollment

questions.   Medicare Carriers also handled claims, appeals, identified billing errors, and answered

any beneficiary inquires.

23.     Providers obtained Medicare Part A reimbursement from carriers pursuant to written provider agreements on the basis of reasonable charges for covered services provided to beneficiaries.   The carriers received, processed, and paid or rejected those claims according to Medicare rules, regulations and procedures.

24.     CMS notified Medicare providers of billing criteria and coverage of services through Medicare Policy Manuals, Carrier Supplier Manuals, Local Coverage Determinations and newsletters published on the Internet, and through sections of the Social Security Act.

25.     In the Medicare program, participating providers agreed to bill only for services the provider actually rendered, that were reasonable, and specified on a Plan of Care (42 CFR Section 441.15).   To qualify for the Medicare home health benefit, under §§1814(a)(2)(C) and 1835(a)(2)(A) of the Act, a Medicare beneficiary must have met the following requirements:   (1) been homebound; (2) received services under a plan of care established and periodically reviewed by a physician; (3) have been in need of skilled nursing care on an intermittent basis or physical therapy or speech-language pathology; or, had a continuing need for occupational therapy.

PASSPORT Program

26.     PASSPORT offered home health care and community-based services to individuals as an alternative to institutionalization or nursing home care. PASSPORT was funded with state and federal funds under the Medicaid Waiver program.   PASSPORT contracted with Medicare and Medicaid-certified home care agencies to provide services to eligible individuals. The PASSPORT program did not require a provider to be certified by Medicare in order to provide home health services.

27.     The Ohio Department of Aging ("ODA") administered the PASSPORT program. Reimbursement for PASSPORT services required the provider to have a Medicaid number that had a waiver designation code.   ODM assigned the PASSPORT waiver designation code to an existing provider Medicaid number, or assigned a new number to the provider to be used exclusively for reimbursement of waiver services.

28.     On or about March 11, 2005, JLF II signed a Medicaid Waiver Provider Enrollment to provide service under PASSPORT.   On December 8, 2005, JLF II received PASSPORT provider number xxxx990.

Veteran Affairs

29.     The United States Department of Veterans Affairs ("VA") was an agency of the United States Government, which administered a variety of benefits and services that provided financial and other forms of assistance to service-members, veterans, their dependents and survivors.   The VA operated the nation's largest integrated health care system, with more than 1,700 hospitals, clinics, community living centers, domiciliaries, readjustment counseling centers, and other facilities.

30.     From on or about January 15, 2009, through on or about November 30, 2014, the VA Medical Center used JLF III to provide unskilled Home Health Care services to veterans. These contracts required JLF III to be certified in the Medicare program or approved by the Medicaid program.   The VA also required JLF III to be licensed or appropriately-certified in good standing with licensing bodies.   The contract further specified that payments made by the VA to JLF III under the agreement constituted the total cost of care.

31.     JLF III submitted billings in part using CMS Form 1500 that advised JLF III, as the submitting provider, that anyone who knowingly filed a statement of claim containing any

8

misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

<u>Suspension of JLF II and JLF III</u>

32.　"Medical review" was a term for the process Medicare contractors used to examine data and request supporting documentation for claims submitted to Medicare. The goal of the medical review program was to reduce payment errors by identifying and addressing documentation and billing errors concerning coverage and coding made by providers.

33.　Palmetto GBA was a company that had a contract with CMS to oversee the administration of home health services in Ohio.　On December 16, 2011, Palmetto placed JLF III on a provider specific edit.　The edit criteria used data analysis to compare JLF III's billing of home health services against peer norms in their aggregate length of stay and disbursement per beneficiary for paid claims January through September 2011.

34.　On or about January 23, 2012, Palmetto sent JLF III a letter explaining, "Palmetto is tasked with preventing inappropriate Medicare payments. This is accomplished through provider education and training and the medical review of claims."　Palmetto informed JLF III it was being placed on a "Probe/Sample Review" to verify there were no potential errors in services provided or billed.　As part of the probe/sample review, Palmetto began reviewing JLF III on a quarterly basis and the submitted claims for the sample were not paid until Palmetto deemed the claim appropriate.

35.　On or about July 5, 2013, Palmetto sent a letter to JLF III explaining the reason for the denied claims, and informed JLF III it was being placed on a "Corrective Action Plan" (CAP). CAP was a written plan of action developed by the provider in response to a charge denial rate

9

greater than 67% after extended medical review of claims with limited or no significant improvement in the denial rate.

36.     After being subject to review for over approximately one year, on or about January 9, 2014, JLF III received a Notice of Suspension of Medicare Payments.

37.     On or about January 10, 2014, ODM sent JLF II and JLF III a Notice of Suspension of Payments suspending Medicaid payments.

Elegance Home Health, Inc.

38.     On or about February 20, 2014, shortly after JLF II and JLF III were suspended and could no longer receive reimbursement payments from Medicare and Medicaid, ADAMS and I.KNIGHT incorporated Elegance to operate as a home health care provider.   Elegance conducted its business at 839 East Market Street, Suite 122, Akron, Ohio.

39.     As with JLF III, in order for Elegance to be an approved HHA and reimbursed by Medicaid, ADAMS and I.KNIGHT obtained certification for Elegance through CMS, and entered into a "provider agreement" with ODJFS/ODM in which the provider agreed to provide truthful and accurate information on the application and agreed to comply with all applicable Medicaid statutes, regulations and guidelines.

40.     On or about February 20, 2014, Elegance submitted, via US Mail, a Medicare Provider Enrollment Application, CMS Form 855a, to Palmetto GBA. I.KNIGHT signed the CMS 855a under the Title "Administrator."   ADAMS was listed as a contact person if questions arose during the processing of the application.

41.     The CMS 855a application contained Section 14 titled "Penalties for Falsifying Information."   This section explained the penalties for deliberately furnishing false information in

10

this application to gain or maintain enrollment in the Medicare program. The application also detailed the possible criminal penalties for providing a false statement under Section 1128B(a)(1) of the Social Security Act stating, "Authorizing criminal penalties against any individual who 'Knowingly and Willfully' makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Federal health care program."

42. On or about March 15, 2014, by certified mail, Elegance submitted additional pages of the CMS Form 855a to Palmetto GBA. Page 16, Section 3 of the CMS 855a concerned "Final Legal Actions/Convictions." Within this section were questions regarding exclusions, revocations or suspensions. Question number 4 asked, "Any current Medicare payment suspension under any Medicare billing number?" In response to the question, "Has your organization, under any current or former name or business identity, ever had a final adverse action listed on page 16 of this application imposed against it?" ADAMS and I.KNIGHT checked, and caused to be checked, the box labeled "NO." On or about March 14, 2014, I.KNIGHT signed the certification statement of the CMS 855a with this information under the title of "Administrator."

43. Once an application was submitted, CMS outlined the requirements to become an HHA. Medicare required home health agencies to become accredited by an approved accreditor before they were able to participate with Medicare. Accreditation was a process of review that home health agencies participated in to demonstrate the ability to meet predetermined criteria and standards. Accreditation companies conducted on-site surveys.

44. Accreditation Commission for Health Care Inc. ("ACHC") was a national healthcare accrediting organization that was assigned to do the survey of Elegance. On or about February 28, 2014, ACHC sent an Accreditation Agreement to Elegance.

11

45. On or about March 11, 2014, Elegance entered into an Agreement for Accreditation with ACHA. The contract was signed by I.KNIGHT, and listed ADAMS' contact information under the "PROVIDER Contact Information" as the Assistant Administrator.

46. As part of the Agreement for Accreditation on behalf of Elegance as the "PROVIDER," I.KNIGHT certified that "all of the information that [Elegance] furnished to ACHC is accurate and complete," and that Elegance "has informed ACHC of any of the following events, at any PROVIDER Location: Suspension, Revocation or any probation condition on a license; Revocation of a Medicare, Medicaid or Third Party Provide Number; ... or Any open investigation by a regulatory or governmental authority."

### The Violation

47. From on or about November 21, 2007, through on or about November 30, 2014, in the Northern District of Ohio, Eastern Division, DELORES L. KNIGHT, THERESA L. ADAMS, ISAAC R. KNIGHT, and SONJA N. FERRELL, and others known and unknown to the Grand Jury, did knowingly and voluntarily combine, and agree between themselves, and with other persons unknown to the Grand Jury to commit the offense of health care fraud, that is to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, that is, Medicaid, Medicare, PASSPORT and the VA, and to obtain, by means of false and fraudulent pretenses, representations and promises, any of the money and property owned by, and under the custody and control of a health care benefit program, that is Medicaid, Medicare, PASSPORT and the VA, in connection with the delivery of and payment for health care benefits and services in violation of Title 18, United States Code, Section 1347.

12

## Objects of the Conspiracy

48.     The objects of the conspiracy were to unlawfully (1) defraud Medicaid, Medicare, PASSPORT and the VA; (2) obtain payments on claims to which the conspirators knew they were not entitled: and, (3) enrich the conspirators.

## Manner and Means

It was part of the conspiracy that:

49.     D.KNIGHT, ADAMS, I.KNIGHT, and FERRELL prepared, and caused to be prepared, Home Health Certifications, CMS Form 485s, Care Needs Summary forms, facsimiles of Doctor's Orders, Outcome and Assessment Information Set ("OASIS" forms), skilled nursing visit notes, and home health aide visit reports containing one or more false and forged signatures of doctors, nurses, home health aides, or patients to support claims for services.

50.     D.KNIGHT, ADAMS, I.KNIGHT, and FERRELL prepared, and caused to be prepared, false Plans of Care to support claims for home health services billed to Medicare, Medicaid and PASSPORT by manipulating previously signed 485 forms by doctors, having RNs sign Form 485s for patients they did not provide face-to-face services, and by continuing to treat and bill patients without a valid, signed Form 485 by a physician.

51.     D.KNIGHT, ADAMS, I.KNIGHT and FERRELL submitted, and caused to be submitted, claims to Medicaid, Medicare, and VA through JLF III for home health services that were not provided.

52.     D.KNIGHT, ADAMS, I.KNIGHT and FERRELL submitted, and caused to be submitted, claims to Medicaid, Medicare, and VA through JLF III for home health services that were provided by unqualified or unauthorized persons.

13

53.     D.KNIGHT, ADAMS, I.KNIGHT and FERRELL submitted, and caused to be submitted, claims to PASSPORT through JLF II for home health services that were not provided or were provided by unqualified or unauthorized persons.

54.     D.KNIGHT, ADAMS, I.KNIGHT and JLF II and JLF III employed, or caused to be employed, individuals to coordinate and provide home health services to various Medicaid patients knowing that several of these employees had criminal records that disqualified them from providing care, or had been excluded from participating in Medicare, Medicaid and all federal health care programs.

55.     D.KNIGHT, ADAMS, I.KNIGHT and FERRELL placed, and caused to be placed, checkmarks on home health aides' notes stating that home health care services were provided, when in fact they knew, and should have known, that the home health services had not been provided.

56.     D.KNIGHT, ADAMS, I.KNIGHT and FERRELL submitted, and caused to be submitted, claims to health care benefit programs for home health care services for patients they knew, and should have known, were hospitalized at the time the claims for home health care services were submitted.

57.     D.KNIGHT, ADAMS, I.KNIGHT and FERRELL submitted, and caused to be submitted, claims to Medicaid, Medicare and VA for the same home health care services that they knew, and should have known, were not allowed to be billed simultaneously to multiple health care benefit programs, pursuant to their contracts.

58.     Between on or about November 11, 2007, through on or about November 30, 2014, JLF II and JLF III received payments from Medicaid, Medicare, PASSPORT, and the VA on

14

claims for the same nursing and home health aide services by using several different codes in the Health Care Common Procedure Coding System "HCPCS" for the same services.

59.     From on or about January 15, 2009, through on or about November 30, 2014, D.KNIGHT, on behalf of JLF III, signed the VA Application to provide unskilled Home Health Care services to veterans falsely identifying Dr. W.C. as a physician advisor to JLF III.

Loss Attributable to Conspiracy

60.     Between on or about November 21, 2007, through on or about November 30, 2014, Medicaid paid JLF III approximately $8,212,030, based on claims submitted of approximately $8,732,933; Medicare paid JLF III approximately $3,734,453, based on claims submitted of approximately $13,482,469; and, the VA paid JLF III approximately $429,603, based on claims submitted of approximately $624,241.   A substantial number of claims were based upon false and fraudulent documents.

61.     Between on or about November 21, 2007, through on or about November 30, 2014, PASSPORT paid JLF II approximately $6,098,113, based on claims submitted of approximately $6,099,498.   A substantial number of claims were based upon false and fraudulent documents.

62.     As a result of the conspiracy, Medicaid, Medicare, PASSPORT and VA suffered a loss in excess of $7.0 million.

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 2

(Health Care Fraud -18 U.S.C. §§ 1347 and 2)

63.     The Grand Jury herewith incorporates the general allegations and the factual allegations of paragraphs 1 through 46, and paragraphs 49 through 62 of Count 1 of this Indictment.

64.     Between on or about November 21, 2007, through on or about January 10, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants DELORES L. KNIGHT, THERESA L. ADAMS, ISAAC R. KNIGHT, SONJA N. FERRELL, and JULIET L. BONNER, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud health care benefit programs, that is, the Ohio Medicaid program, Medicare, and PASSPORT, and to obtain by false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of health care benefit programs, the Ohio Medicaid program, Medicare, and PASSPORT, by causing false and fraudulent claims to be submitted to Medicaid, Medicare, and PASSPORT in connection with the delivery of and payment for health care benefits, items and services.

All in violation of Title 18, United States Code, Sections 1347 and 2.

The Grand Jury further charges:

## COUNT 3

(Health Care Fraud -18 U.S.C. §§ 1347 and 2)

65.     The Grand Jury herewith incorporates the general allegations and the factual allegations of paragraphs 1 through 46, and paragraphs 49 through 62 of Count 1 of this Indictment.

66.     Between on or about November 21, 2007, through on or about November 30, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants DELORES L. KNIGHT, THERESA L. ADAMS, ISAAC R. KNIGHT, and SONJA N. FERRELL, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud a health care benefit program, that is, the United States Department of Veterans Affairs ("VA"), and to obtain by false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program, the VA, by causing false and fraudulent claims to be submitted to the VA in connection with the delivery of and payment for health care benefits, items and services.

All in violation of Title 18, United States Code, Sections 1347 and 2.

The Grand Jury further charges:

## COUNT 4

(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

67.     The Grand Jury herewith incorporates the general allegations and the factual allegations of paragraphs 1 through 46, and paragraphs 49 through 62 of Count 1 of this Indictment.

68.     On or about March 15, 2014, in the Northern District of Ohio, Defendant ISAAC R. KNIGHT, in a matter involving a health care benefit program, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, and make and use any materially false writing and document knowing the same to contain any materially false, fictitious and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, I.KNIGHT submitted and caused to be submitted, via US

17

Mail, a Medicare Provider Enrollment Application, CMS Form 855a, to Palmetto GBA.

I.KNIGHT signed the CMS 855a under the Title "Administrator" that contained a materially false,

fictitious and fraudulent statement and entry in response to the question, "Has your organization,

under any current or former name or business identity, ever had a final adverse action listed on

page 16 of this application imposed against it?", by checking the "NO" box, when in fact

I.KNIGHT knew that he and JLF II and JLF III had been suspended by Medicaid previously.

All in violation of Title 18, United States Code, Section 1035.

The Grand Jury further charges:

## COUNT 5

(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

69.     The Grand Jury herewith incorporates the general allegations and the factual

allegations of paragraphs 1 through 46, and paragraphs 49 through 62 of Count 1 of this

Indictment.

70.     On or about July 29, 30, and 31, 2014, in the Northern District of Ohio, Defendant

THERESA L. ADAMS, in a matter involving a health care benefit program, did knowingly and

willfully make a materially false, fictitious, and fraudulent statement and representation, and make

and use any materially false writing and document knowing the same to contain any materially

false, fictitious and fraudulent statement and entry, in connection with the delivery of and payment

for health care benefits, items and services; that is, in connection with Elegance's application as

described in paragraphs 38 through 46, ADAMS provided and caused to be provided a listing of

Elegance Home Health's Professional Advisory Committee ("PAC") members to an ACHC

18

surveyor during an on-site survey of Elegance containing names of individuals she knew were not involved with Elegance's PAC.

All in violation of Title 18, United States Code, Section 1035.

The Grand Jury further charges:

## COUNT 6

(Aggravated Identity Theft, 18 U.S.C. §§ 1028A(a)(1) and 2)

71.     On or about July 29, 30, and 31, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant THERESA L. ADAMS, during and in relation to a felony violation of Title 18, United States Code, Section 1347 (Health Care Fraud), knowingly transferred, possessed and used without lawful authority a means of identification of Dr. P.K., and aided and abetted the transfer, possession and use without lawful authority of a means of identification of Dr. P.K. (a real person known to the Grand Jury), knowing that the means of identification belonged to another person.

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

The Grand Jury further charges:

## COUNT 7

(Money Laundering – 18 U.S.C. § 1957)

72.     On or about December 15, 2010, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit:

19

D.KNIGHT withdrew, and caused to be withdrawn, a check from JLF III's Huntington National Bank account x2646 to Drees Homes in the amount of $60,000, knowing said check would be tendered to Drees Homes as partial payment for the real estate and residence constructed at 7915 Ridgetop Drive, Twinsburg, Ohio 44087.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 8

(Money Laundering – 18 U.S.C. § 1957)

73.     On or about December 15, 2010, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: D.KNIGHT withdrew, and caused to be withdrawn, a check from JLF II's Huntington National Bank account x2662 to Drees Homes in the amount of $100,000, knowing said check would be tendered to Drees Homes as partial payment for the purchase of the real estate and residence constructed at 7915 Ridgetop Drive, Twinsburg, Ohio 44087.

All in violation of Title 18, United States Code, Section 1957.

20

The Grand Jury further charges:

## COUNT 9

(Money Laundering – 18 U.S.C. § 1957)

74.     On or about January 7, 2011, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: D.KNIGHT withdrew, and caused to be withdrawn, funds on deposit with JLF III's Huntington National Bank account x2646 to purchase a $43,722.53 Huntington National Bank cashier's check made payable to First American Title, knowing said check would be tendered to First American Title Insurance Company as partial payment for the purchase of the real estate and residence constructed at 7915 Ridgetop Drive, Twinsburg, Ohio 44087.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 10

(Money Laundering – 18 U.S.C. § 1957)

75.     On or about March 21, 2011, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is,

21

health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: D.KNIGHT withdrew, and caused to be withdrawn, funds on deposit with JLF II's Huntington National Bank account x2662 to purchase a $125,000 Huntington National Bank cashier's check made payable to Drees Homes and tendering said check to Drees Homes as partial payment for the real estate and residence constructed at 1048 Morning Glory Drive, Macedonia, Ohio 44056.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 11

### (Money Laundering – 18 U.S.C. § 1957)

76. On or about April 27, 2011, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: D.KNIGHT withdrew, and caused to be withdrawn, funds on deposit with JLF III's Huntington National Bank account x2646 to purchase a $185,493.65 Huntington National Bank cashier's check made payable to First American Title Insurance Company and tendering said check to First American Title Insurance Company as partial payment for the real estate and residence constructed at 1048 Morning Glory Drive, Macedonia, Ohio 44056.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 12

(Money Laundering – 18 U.S.C. § 1957)

77.    On or about August 15, 2011, in the Northern District of Ohio, Eastern Division,

and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage

in a monetary transaction affecting interstate commerce in criminally derived property of a value

greater than $10,000, such property having been derived from specified unlawful activity, that is,

health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to

commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit:

D.KNIGHT withdrew, and caused to be withdrawn, funds on deposit with JLF III's Huntington

National Bank account x2646 to pay via a debit card attached to said account $11,451.80 to R. G.

Thomas Landscape & Design, Inc. as partial payment for landscaping at 7915 Ridgetop Drive,

Twinsburg, Ohio 44087.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 13

(Money Laundering – 18 U.S.C. § 1957)

78.    On or about August 13, 2011, in the Northern District of Ohio, Eastern Division,

and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage

in a monetary transaction affecting interstate commerce in criminally derived property of a value

greater than $10,000, such property having been derived from specified unlawful activity, that is,

health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to

23

commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit:

D.KNIGHT withdrew, and caused to be withdrawn, funds on deposit with JLF II's Huntington National Bank account x2662 to pay via a debit card attached to said account $11,633.89 to R. G. Thomas Landscape & Design, Inc. as partial payment for landscaping at 1048 Morning Glory Drive, Macedonia, Ohio 44056.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 14

(Money Laundering – 18 U.S.C. § 1957)

79.     On or about October 20, 2011, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit:

D.KNIGHT withdrew, and caused to be withdrawn, a check from JLF III's Huntington National Bank account x2646 to R. G. Thomas Landscape & Design, Inc. in the amount of $22,917.38 and tendering said check to R. G. Thomas Landscape & Design, Inc. as partial payment for landscaping at 7915 Ridgetop Drive, Twinsburg, Ohio 44087.

All in violation of Title 18, United States Code, Section 1957.

24

The Grand Jury further charges:

## COUNT 15

(Money Laundering – 18 U.S.C. § 1957)

80.     On or about December 3, 2011, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DELORES L. KNIGHT did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: D.KNIGHT withdrew, and caused to be withdrawn, a check from JLF II's Huntington National Bank account x2662 to R. G. Thomas Landscape & Design, Inc. in the amount of $22,548.29 and tendering said check to R. G. Thomas Landscape & Design, Inc. as partial payment for landscaping at 1048 Morning Glory Drive, Macedonia, Ohio 44056.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 16

(Money Laundering – 18 U.S.C. § 1957)

81.     On or about November 22, 2010, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant THERESA L. ADAMS did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to

25

commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: ADAMS withdrew, and caused to be withdrawn, funds on deposit with JLF II's Huntington National Bank account x2662 to purchase a $30,000 Huntington National Bank cashier's check made payable to Dree's Homes and tendering said check to Drees Homes as partial payment for the purchase of the real estate and residence constructed at 7915 Ridgetop Drive, Twinsburg, Ohio 44087.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## COUNT 17

### (Money Laundering – 18 U.S.C. § 1957)

82.     On or about August 1, 2011, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant THERESA L. ADAMS did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: ADAMS withdrew, and caused to be withdrawn, funds on deposit with JLF III's Huntington National Bank account x2646 to purchase a $36,000 Huntington National Bank cashier's check made payable to Metro Lexus and tendering said check to Metro Lexus as partial payment for the purchase of a 2011 Lexus IS250.

All in violation of Title 18, United States Code, Section 1957.

26

The Grand Jury further charges:

## COUNT 18

### (Money Laundering – 18 U.S.C. § 1957)

83.     On or about December 18, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant THERESA L. ADAMS did knowingly engage in and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, to wit: ADAMS withdrew, and caused to be withdrawn, $74,320.36 on deposit with JLF III's Huntington National Bank account x2646 to purchase a $74,314.36 Huntington National Bank cashier's check made payable to Audi Willoughby, knowing said check would be tendered to Audi Willoughby as partial payment for the purchase of a 2013 Audi A7.

All in violation of Title 18, United States Code, Section 1957.

## FORFEITURE

The Grand Jury further charges:

### FORFEITURE UNDER 18 U.S.C. § 982(a)(7) – COUNTS 1-5

1.     The allegations of Counts 1-5 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a) (7). As a result of the foregoing offenses, Defendants DELORES L. KNIGHT, THERESA L. ADAMS, ISAAC R. KNIGHT, SONJA N. FERRELL, and JULIET L. BONNER shall forfeit to the United States all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses; including, but not limited to, the following:

27

a.)     1048 Morning Glory Drive, Macedonia, Summit County, Ohio, Permanent Parcel No.: 33-13189.  The record owner of the property is DELORES L. KNIGHT.  The legal description of the property is as follows: Situated in the City of Macedonia, County of Summit and State of Ohio, and known as being Lot number Forty Two (42) in The Gardens at Highland Phase Two and recorded in Reception No. 55726131 of Summit County Map Records, be the same more or less but subject to all legal highways.

b.)     7915 Ridgetop Drive, Twinsburg, Summit County, Ohio, Permanent Parcel No.: 62-05517.  The record owner of the property is THERESA L. ADAMS.  The legal description of the property is as follows: Situated in the Township of Twinsburg, County of Summit and State of Ohio, and known as being all of Lot Fourteen (14) in the Ridge Top Estates Subdivision No. 1 as recorded in Reception No. 55096860 of the Summit County Records, be the same more or less but subject to all legal highways.

c.)     MONEY JUDGMENT: Defendants DELORES L. KNIGHT, THERESA L. ADAMS, ISAAC R. KNIGHT, SONJA N. FERRELL, JULIET L. BONNER shall forfeit property, including, but not limited to, an amount of money equal to the proceeds of Counts 1-5.

FORFEITURE UNDER 18 U.S.C. § 982(a)(1) – COUNTS 7-18

1.     The allegations of Counts 7-18 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(1).  As a result of the foregoing offenses, Defendants DELORES L. KNIGHT and THERESA L. ADAMS shall forfeit to the United States all property, real and personal, involved in such offenses, and all property traceable to such property; including, but not limited to, the following:

28

a.)      1048 Morning Glory Drive, Macedonia, Summit County, Ohio, Permanent Parcel No.: 33-13189.  The record owner of the property is DELORES L. KNIGHT.  The legal description of the property is as follows: Situated in the City of Macedonia, County of Summit and State of Ohio, and known as being Lot number Forty Two (42) in The Gardens at Highland Phase Two and recorded in Reception No. 55726131 of Summit County Map Records, be the same more or less but subject to all legal highways.

b.)      7915 Ridgetop Drive, Twinsburg, Summit County, Ohio, Permanent Parcel No.: 62-05517.  The record owner of the property is THERESA L. ADAMS.  The legal description of the property is as follows: Situated in the Township of Twinsburg, County of Summit and State of Ohio, and known as being all of Lot Fourteen (14) in the Ridge Top Estates Subdivision No. 1 as recorded in Reception No. 55096860 of the Summit County Records, be the same more or less but subject to all legal highways.

c.)      MONEY JUDGMENT: Defendants DELORES L. KNIGHT and THERESA L. ADAMS shall forfeit property, including, but not limited to, a sum of money equal to the value of all property involved in Counts 7-18.

## SUBSTITUTE PROPERTY

1.      In the event that any property subject to forfeiture under 18 U.S.C. § 982(a)(7) and/or 18 U.S.C. § 982(a)(1), as a result of any act or omission of the defendant(s):

a.)      cannot be located upon exercise of due diligence;

b.)      has been transferred or sold to, or deposited with a third party;

c.)      has been placed beyond the jurisdiction of this Court;

d.)      has been substantially diminished in value; or,

29

e.)      has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) [as incorporated by 18 U.S.C. § 982(b)(1)], to seek forfeiture of any other property of the defendant(s), up to an amount equivalent to the value of the forfeitable property described above.

A TRUE BILL.

Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.

30